UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| PENNY BENTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 1:10-CV-00918-DML-LJM |
| | ) |
| HAMILTON EAST PUBLIC LIBRARY, | ) |
| | ) |
| Defendant. | ) |

# Findings of Fact and Conclusions of Law
# Following Bench Trial

This matter came before the court for a bench trial on February 21, 2012, to resolve plaintiff Penny Benton's action, under Title VII, 42 U.S.C. §§2000e-2(a) and 2000e-3, and 42 U.S.C. §1981, against her former employer, defendant Hamilton East Public Library ("Library"). Ms. Benton claims the Library terminated her employment because of her race and in retaliation for her having complained of and filed a charge of race discrimination with the EEOC and for a prior race discrimination lawsuit she had filed against the Library. Having heard and weighed the evidence and considered the parties' arguments, and for the reasons discussed below, the court finds that Ms. Benton did not prove that the Library terminated her employment because of her race or in retaliation for her complaints of race discrimination. Consequently, judgment will be entered in favor of Hamilton East Public Library.[1]

---

[1] The parties consented to the magistrate judge conducting all proceedings and ordering the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

### Analytical Framework for Court's Consideration of the Evidence

Title VII prohibits an employer from terminating an individual's employment because of the individual's race. 42 U.S.C. §2000e-2(a)(1). Under 42 U.S.C. §1981, a person is entitled to enjoy the same terms and conditions of employment that her employer affords to its "white" employees, and thus discrimination against a "non-white" person in the terms and conditions of her employment is forbidden.[2] Discrimination claims under section 1981 are analyzed in essentially the same manner as claims brought under Title VII. *Yancick v. Hanna Steel Corp.,* 653 F.3d 532, 544 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.,* 626 F.3d 382, 389 (7th Cir. 2010) (elements of race discrimination claims under section 1981 and Title VII are essentially identical).

Title VII also prohibits retaliatory action against an employee because she has brought a charge of race discrimination or participated in any proceeding under Title VII. 42 U.S.C. §2000e-3(a); *Silverman v. Board of Education of City of Chicago,* 637 F.3d 729, 740 (7th Cir. 2011) ("Title VII prohibits an employer from taking an adverse employment action against an employee because she has filed an employment discrimination charge."). Retaliatory discharge claims, like Ms. Benton's, are also cognizable under section 1981. *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 399 (7th Cir. 2007) (retaliatory discharge of employment is prohibited by section 1981, as amended by the Civil Rights Act of 1991).

---

[2] Section 1981 provides, generally, that all persons in the United States shall have the same contractual rights as white persons, which include the "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." "The language codified in section 1981 derives from section 1 of the Civil Rights Act of 1866, a Reconstruction-era statute that is generally recognized as the first significant civil rights legislation enacted by Congress. . . ." *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 391 (7th Cir. 2007). The Civil Rights Act of 1866 was enacted by Congress pursuant to section 2 of the Thirteenth Amendment to enforce the Amendment's prohibition of slavery. *Id.*

The court pauses here to comment on the parties' legal arguments—particularly the Library's—made in pre- and post-trial briefing regarding the analytical framework for this court's weighing and consideration of the evidence presented at trial. Pointing to myriad Seventh Circuit cases reviewing summary judgment rulings in Title VII cases, the Library asks the court to analyze whether Ms. Benton proved her claims at trial according to the *McDonnell Douglas* burden-shifting analytical framework. But the burden-shifting framework under *McDonnell Douglas* does not control the consideration of evidence by the fact-finder at trial. Rather, it provides the framework for parties and courts to analyze a plaintiff's discrimination case when the employer moves for summary judgment. The framework recognizes that in a Title VII (and section 1981) case, it is difficult for the plaintiff to garner direct evidence that racial animus motivated the employer's decision.

The Supreme Court (and the Seventh Circuit in many ensuing cases) has established a means by which a plaintiff faced with his employer's summary judgment motion denying that the employment decision had anything to do with the plaintiff's race may make a showing that a trial is necessary to decide if race motivated the employer. *See Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121 (1985) (quoting *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014 (1st Cir. 1979) ("The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that that 'plaintiff [has] his day in court despite the unavailability of direct evidence.'"); *Coleman v. Donahoe,* 667 F.3d 835, 845 (7th Cir. 2012) (internal citation omitted) (summary judgment case; *McDonnell Douglas* framework is designed to "'sharpen the inquiry into the elusive factual question of intentional discrimination'").

As the courts have made clear, summary judgment against the plaintiff may not be entered if the plaintiff has "direct" evidence of race discrimination—an admission of race-based

3

decision making or a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination, such as statements by the employer suggesting the influence of race, or behavior toward or comments directed at African American employees that reference race or that are not also directed at similarly-situated white employees in similar situations. *E.g., Silverman v. Board of Education,* 637 F.3d 729, 733-34 (7th Cir. 2011). This mosaic is simply an amalgamation of evidence through which intentional discrimination can be logically inferred. *Luks v. Baxter Healthcare Corp.,* 467 F.3d 1049, 1052 (7th Cir. 2006).

An employee also can show that a genuine issue for trial exists by the "indirect" method of proof. That method generally requires a plaintiff to show that she is a member of a protected class, was meeting the employer's legitimate job expectations, suffered an adverse employment action, and that similarly-situated employees not in the protected class were treated more favorably. *Coleman,* 667 F.3d at 845; *Silverman*, 637 F.3d at 736. When those elements are shown, a presumption arises that the employer acted with racial animus. *Coleman,* 667 F.3d at 845. That showing shifts the burden to the employer to provide evidence of a non-discriminatory reason for its decision which, if met, shifts back to the employee to present evidence why the employer should not be believed. *See Coleman*, 667 F.3d at 845, 852. If the plaintiff meets her burden, then her case cannot be disposed on summary judgment and she is entitled to a trial.

When an employment discrimination case goes to trial as this one did, the *McDonnell Douglas* burden-shifting framework is not applied. *See Hall v. Forest River, Inc.,* 536 F.3d 615, 621 (7th Cir. 2008) ("[O]nce evidence has been presented at trial, the burden-shifting of the *McDonnell Douglas* method falls away, and the question is simply whether that evidence is sufficient to allow a reasonable jury to find in favor of the plaintiff"). At trial, Ms. Benton was not required to show, for example, that she met the legitimate expectations of the Library or that

4

similarly situated white employees were not fired—although such evidence logically might tend to prove that she was fired because of her race.

The question for the court, as the fact-finder, is simply whether after weighing and considering all the evidence—direct, "indirect," and circumstantial, and from all the trial witnesses and the exhibits—Ms. Benton has demonstrated by a preponderance of the evidence that the Library terminated her employment because she is African American or in retaliation for her having previously complained of race discrimination.

### **Findings of Fact**

1.  Plaintiff Penny Benton is an African American who was employed as a part-time circulation clerk by defendant Hamilton East Public Library from January 2007 until March 31, 2010, when her employment was terminated.

2.  The Library is a public library system located in Hamilton County, Indiana. It operates two library branches, one in Fishers, Indiana, and one in Noblesville, Indiana.

3.  Ms. Benton worked as a circulation clerk at both branches, but beginning in about January 2009, and at her request, she worked only at the Fishers branch, which was closer to her home.

4.  The Library's circulation department consists of a branch supervisor at each branch, who supervises the clerks who work at the circulation desk. The Library uses part-time and full-time circulation clerks.

5.  Ms. Benton was a part-time clerk during the entire period of her employment and worked about 15 to 20 hours per week, with at least one shift during Saturday or Sunday hours.

6. From the Fall of 2007 to the end of her employment, Ms. Benton's immediate supervisor at the Fishers branch was Rex Miller, its circulation department supervisor. When she worked at the Noblesville branch, Ms. Benton's immediate supervisor was Mary Lou Madison.

7. The Library considers its circulation department vital to the Library's business and its patrons. Employees within the circulation department are often the first point of contact between patrons and the Library. They are the most commonly used information source for patrons, and they check out materials to patrons and check them back in. As the Library's face to patrons, circulation clerks are expected to display a pleasant and cooperative attitude toward patrons, as well as toward fellow employees.

8. Typically at any one time, each branch is staffed with two to three circulation clerks, and each branch functions best when the circulation department is fully staffed.

9. The Library scheduled the working hours of part-time clerks in advance and, based on information from the clerks, strived to create standard working hours for each clerk to give predictability to their schedules. Like all other part-time clerks, Ms. Benton received the periodic schedules informing her of the dates and times she was expected to work.

10. If a part-time clerk could not or did not want to work her scheduled shift, she was required to find a substitute to work her shift. This policy did not apply to emergency or other situations in which advance notice was not possible, such as an illness.

11. If a circulation clerk had an emergency that interfered with her ability to work her scheduled shift, she was expected to notify the Library of that emergency before the beginning of the scheduled shift if at all possible.

12. The Library also expected circulation clerks to work their entire scheduled shifts and not leave early before the end of scheduled shifts.

13. The Library periodically conducted in-service training and informational meetings for Library employees, at which employees were trained on various aspects of their jobs and were informed of updates or revisions to Library procedures and protocols. The circulations department conducted in-service meetings about four times per year. Attendance by the circulation clerks was mandatory, and the clerks were paid for the hours they spent at the in-service meetings.

14. If a circulation clerk wanted to be excused from attending an in-service meeting, she was required to get advance permission to do so by providing a written request to the head of the circulation department, who had the discretion to approve or deny the request.

15. The in-service meetings were important training events. Even if an employee's absence was excused, missing a meeting meant the employee was behind in training and other measures were necessary to inform the absent employee of new or revised procedures. An employee's repeated absences from mandatory training posed management problems for the Library.

16. In 2007 and 2008, Ms. Benton was counseled and disciplined for job performance problems. The job performance issues often were documented and led to formal discipline, including:

- A written warning dated September 4, 2007, which was imposed for multiple incidents, including arriving to work late, not performing job tasks at the front desk, and leaving her shift by the wrong exit. (Exhibit 7).[3]

- A written warning dated October 1, 2007, which was given for leaving by the wrong exit. (Exhibit 8).

---

[3] Trial exhibits 1-132 were admitted into evidence with the stipulation of the parties.

7

- A written warning dated March 13, 2008, concerning errors in registering patrons for library cards, and Ms. Benton's intention not to attend the April 18, 2008 circulation department in-service meeting. (Exhibit 13). The warning recounts that Ms. Benton had missed the August 2007 and January 2008 in-service meetings.

- A Plan for Success, implemented on May 1, 2008, by which the Library addressed the need for Ms. Benton to focus on courtesy and cooperativeness at the front desk and arrive at work on time. (Exhibit 15). Ms. Benton refused to sign this document.

- An incident report dated May 31, 2008, which states that Ms. Benton had not been wearing her name tag and had been arriving to work a few minutes after her shift begins and leaving work a few minutes before her shift ended. (Exhibit 17).

- An incident report dated July 28, 2008, which states that Ms. Benton did not timely arrive at work, inaccurately completed her time card, searched the internet and used a reference desk telephone improperly for personal business, and gave a reason, later believed to be false, for needing to leave work early. (Exhibit 18).

- A disciplinary warning, dated August 12, 2008, addressing Ms. Benton's refusal to wear her name tag, failure to enter the library by the employee entrance, habit of leaving the library before being released from her shift, use of the reference desk telephone for personal calls, and use of the internet for personal business. (Exhibit 25).

17. On August 18, 2008, Ms. Benton filed a charge of race discrimination with the U.S. Equal Employment Opportunity Commissioner (EEOC). (Exhibit 49).

18. The EEOC issued a right to sue letter to Ms. Benton (Exhibit 80) on April 9, 2009.

19. On April 22, 2009, the Library presented to Ms. Benton a "Last Chance Agreement" "in lieu of terminating employment . . . for serious violations of company policy." (Exhibit 85). The document noted that Ms. Benton had been issuing new borrower cards to persons who did not satisfy the Library's rules for cards, including a patron who owed nearly $100 in unpaid finds going back to 2002. Ms. Benton refused to sign the Agreement.

20. On April 21, 2009, Ms. Benton filed a complaint *pro se* in this court against the Library alleging that it had discriminated against her because of her race and had retaliated against her because of her engaging in protected conduct, all in violation of Title VII. That litigation was settled under the terms of a written agreement signed by the parties in mid-December 2009. (Exhibit 112).

21. Among other terms of the settlement agreement, the Library paid Ms. Benton $10,000 in exchange for a release and dismissal of the lawsuit. Ms. Benton agreed to, and did, release the Library from any claims or demands, whether known or unknown and whether asserted or not, arising out of her employment relationship with the Library. (Exhibit 112, ¶ 4). The Library denied any wrongdoing, and the Agreement provides that it "may not be introduced in any proceeding or matter as evidence of admission of wrongdoing, or culpability or of the validity of any claims, whether asserted or unasserted." (*Id.,* ¶ 5). In addition, the parties agreed that the settlement did not "waive or expunge any documentation or notations contained within [Ms. Benton's] record of employment and shall not impact any future employment action contemplated by either party." (*Id.,* ¶ 7).

22. Ms. Benton remained an employee of the Library, still working as a part-time circulation clerk at the Fishers branch.

23. Ms. Benton testified that both before and after the settlement, she felt she was harassed because she is black and was treated differently from white employees by her supervisor. Ms. Benton stated that her supervisor—Rex Miller—required her to meet with him in his office where he would yell and scream at her. She testified that these actions frequently made her cry.

24. When asked to be specific about events she felt were the result of racial discrimination or to be specific about how she was treated differently, Ms. Benton testified in only the most general terms. Frequently, she repeated that she was yelled and screamed at by her supervisor, but gave no specifics—no dates, no description of surrounding events, no description of the words used by the supervisor, or any other details. As to potentially similarly situated white employees, Ms. Benton did not identify any and she did not know, and had never inquired, about their personnel records and did not know whether or when any had been disciplined. She knew only that her co-workers were not fired. Ms. Benton presented no evidence that would permit the court to make any meaningful comparison between the Library's treatment of Ms. Benton and its treatment of her white co-workers.

25. The lack of details in Ms. Benton's testimony, the leading nature of the questions her lawyer asked her about the events Ms. Benton felt were racially charged, and Ms. Benton's very general and conclusory testimony ("I was harassed," "My supervisor always yelled and screamed at me," "I felt resentment after filing with the EEOC") made Ms. Benton's testimony less credible.

26.     Ms. Benton also testified that she felt that her supervisor's alleged yelling and screaming at her became worse after the settlement than before, and she felt resentment for having "gone downtown," referring to the EEOC charge and first discrimination lawsuit.

27.     Ms. Benton's supervisor, Rex Miller, denied ever yelling or screaming at Ms. Benton.  He said that he talked to Ms. Benton behind closed doors in his office about her performance around six to eight times over the period he was her supervisor, from October 2007 until Ms. Benton was terminated on March 31, 2010.  Mr. Miller testified that he occasionally talked to other employees in his office about their performance issues and that he dealt with employee issues by having private conversations.  Mr. Miller also testified that he never knew about Ms. Benton's first race discrimination lawsuit until after she was terminated.

28.     The court believes Mr. Miller's testimony.  Though Ms. Benton may have "felt" that her supervisor treated her more harshly after the December 2009 settlement of her race discrimination lawsuit, Mr. Miller did not know about the suit or its settlement.[4]  Those matters could not have influenced his treatment of her.

29.     The court also finds dubious Ms. Benton's testimony that Mr. Miller frequently yelled and screamed at her. (Ms. Benton testified that Mr. Miller yelled at her so many times, she could not count them all).  Ms. Benton and Mr. Miller worked in a library after all, and if yelling and screaming actually had occurred on a relatively regular basis, as Ms. Benton testified, the court expects there would have been at least some corroborating evidence.

30.     Further, there is some documentation by Mr. Miller describing discussions with Ms. Benton regarding performance issues.  They do not have a disrespectful or strident tone.  For

---

[4]     The settlement agreement contains a confidentiality provision, and the evidence indicates the Library was careful to maintain confidentiality so that only high level employees were aware of the settlement. *See* Exhibits 110; 112, ¶ 6.

example, the description of the communication by Mr. Miller to Ms. Benton regarding her failure to come to work in late January 2010 reflects a delicate approach to Ms. Benton, consistent with human nature to "soften the blow" when criticizing another person and to avoid unnecessary confrontation.  *See* Exhibits 115 and 118.  The documents also reflect that Ms. Benton became confrontational when she was actually disciplined with a formal warning or other formal disciplinary measure.  For example, when in late February 2010 Mr. Miller told Ms. Benton that he had to issue a written warning because of Ms. Benton's failure to attend a required quarterly in-service meeting, she said she "didn't care" what he did and she was "going to take this downtown." Exhibit 123.

31.     The formal written warning was issued to Ms. Benton on March 3, 2010, documenting three instances where her attendance at work (or lack thereof) violated Library policy.  Ms. Benton refused to sign and acknowledge the written warning, and said "I'll just take this downtown.  They'll take care of it." Exhibit 122.  Ms. Benton did not refute at trial these descriptions of her responses to discipline.

32.     Ms. Paris Head Pegg, who was serving as the Library's Assistant Director at the time, terminated Ms. Benton's employment on March 31, 2010.  Ms. Pegg was the Assistant Director from October 2008 to March 2011, when she became the interim Director and then Director.  As Assistant Director, she directly supervised all department heads, including heads of the circulation department.  Beginning about the Fall 2009, Ms. Pegg served too as the head of human resources and was in charge of employee disciplinary matters.

33.     In her testimony, Ms. Pegg described the events that led her to terminate Ms. Benton's employment.

34. Ms. Pegg testified that she viewed the settlement agreement with Ms. Benton as a chance for a fresh start, a chance for Ms. Benton to improve on the job performance problems that had led the Library to impose discipline before and which Ms. Benton had asserted were unfairly imposed on her because of her race.[5]

35. In Ms. Pegg's view, Ms. Benton's performance did not improve. On January 23, 2010, Ms. Benton was scheduled to work on a Saturday morning beginning at 9:00 a.m. She left a voice mail on her supervisor's phone at 8:30 that morning that she was taking a vacation day, and then called the Library at 9:15 a.m. and told the employee who answered the phone that she was taking a vacation day and would not be in. The Library was not able to find a replacement worker for the morning, and Ms. Benton's supervisor came to the Library to work the morning of Ms. Benton's shift until a replacement clerk was able to come in. (*See* Exhibit 115). Ms. Benton's actions violated clear and important Library rules. And they left the Library in a lurch—short-staffed on a Saturday without sufficient advance warning, and her supervisor was forced to cover many of her hours so the Library could function properly.

36. Again, on January 30 (a Saturday), upon Ms. Benton's arrival at work at 9:00 a.m., she told her co-workers that she was leaving at 2:00 p.m., even though she was scheduled to work until 5:30 p.m. She had not previously arranged for another employee to complete her

---

[5] The court heard testimony from Melvin Toombs, who was employed at the Fishers branch as a maintenance worker from approximately January 2009 to October 2009, when he was fired by his direct supervisor, Tim Myers. Mr. Toombs is African American and believes "somewhat" that his firing was racially motivated because Mr. Myers once gave him a job assignment—though Mr. Toombs thought it was a joke because it was so outrageous—to use a toothbrush to fix wallpaper problems on a 20-foot high ceiling. The court is not convinced by Mr. Toombs's and Ms. Benton's testimony that the Library in general is a racially hostile environment. Further, Mr. Toombs's employment ended before the settlement agreement (and Ms. Benton had released the Library from all matters occurring before the settlement) and before the events leading to Ms. Benton's termination. For this reason too, the court does not find Mr. Toombs's testimony helpful in evaluating the evidence regarding Ms. Benton's termination.

shift between 2 and 5:30 p.m., and did not try to arrange it that day.  Ms. Benton's actions violated clear and important Library rules.  (*See* Exhibit 118).

37. About three weeks later, Ms. Benton failed to attend a mandatory circulation department in-service meeting on February 19, 2010 (a Friday).  She had not provided any prior written notice or request for an excused absence.  Ms. Benton's actions violated clear and important Library rules.  (*See* Exhibits 119 and 121).  Ms. Benton claimed that car trouble interfered with her ability to attend the meeting, but she had a pattern of not attending the mandatory in-service meetings.  When Ms. Benton's supervisor told her that her unexcused absence would result in a written warning, Ms. Benton said she was being harassed and was going "to take it downtown."  (Exhibit 123).

38. About five weeks later, Ms. Benton failed to show up for her scheduled work shift on March 27 (a Saturday).  She had not given any advance warning she would not come to work, had not received permission not to work that day, had not arranged for another employee to work her shift, and did not call anyone even after her shift began to say that she was not coming to work.  Ms. Benton's actions violated clear and important Library rules.  (*See* Exhibit 126).  Ms. Pegg found these actions particularly egregious; it was "highly unprecedented" for an employee not to show up for work and not inform anyone that she was not coming to work.

39. The Library had had enough.  On March 31, 2010, it terminated Ms. Benton's employment.  It prepared a document notifying Ms. Benton of her termination, which references her failure to report to work on March 27 and her failure to notify anyone or procure a substitute for the shift.  Ms. Head and Mr. Miller (Ms. Benton's supervisor) met with Ms. Benton on March 31 and told her she was terminated, but they but did not deliver the written notice of termination because Ms. Benton left the meeting.  Ms. Benton told Ms. Head that her termination was

because of racial discrimination "and they'll take care of it downtown." (*See* Exhibits 127 and 128).

40.     Ms. Pegg testified she fired Ms. Benton because of the afore-described attendance problems in 2010 and Ms. Benton's failure to meet the expectations of her job. She said no other clerks at the Library had the type of repeated attendance problems of Ms. Benton. The court finds Ms. Pegg's testimony believable and consistent with the documentary evidence.

41.     Ms. Benton urges the court to disbelieve Ms. Pegg. She contends that her job performance issues in 2010 could not have been the true reason for her termination because she had innumerable job performance problems before the settlement of her first race discrimination complaint yet was never fired. She argues that because the Library continued, after the settlement, to find fault with her job performance yet this time fired her, then the court should infer that the only reason for the firing was unlawful race discrimination and retaliation.

42.     The court is not persuaded by Ms. Benton's argument. Her theory suggests that her protected activity immunized her from discipline and allowed her to flout her employer's expectations without fear of recourse. In the face of formal discipline for conduct that she knew violated the Library's attendance rules, Ms. Benton simply said she didn't care and would "take it downtown."

43.     The court is also not persuaded that Ms. Benton's annual performance evaluations reflect the Library's satisfaction with her job performance. If that were so, that fact might allow an inference that the Library's termination was motivated by something other than poor performance. Ms. Benton's counsel argued that if the number of "positive" ratings on her written evaluations outweighed the number of negative ratings, this proved Ms. Benton was a good employee. Ms. Pegg strongly disagreed and stated that she focused on whether an

employee, over time, still had work areas requiring improvement. In her view as the Assistant Director of the Library, an employee who had worked at the Library as long as Ms. Benton had should not still need improvement in many areas. The court finds no basis on which to question the Library's interpretation and use of its own performance evaluations. Further, it makes no sense to the court to conclude that so long as an employee receives an unsatisfactory rating on no more than half of the employer's evaluation categories, she is a good employee. It is also logical for an employer to be concerned that a long-time employee continues to receive numerous low negative ratings.

44. The court is not convinced that the Library's stated reason for terminating Ms. Benton was untrue. The evidence that Ms. Benton, in 2010, had repeated attendance problems that violated clear and important Library rules was overwhelming.

45. Any Conclusion of Law below, to the extent it constitutes a finding of fact, is hereby incorporated by reference as a Finding of Fact.

### Conclusions of Law

1. Ms. Benton's race discrimination claims under Title VII, 42 U.S.C. §2000e-2(a)(1), and 42 U.S.C. §1981 required her to prove, by a preponderance of the evidence, that the Library terminated her because she is African American. *Montgomery v. American Airlines, Inc.,* 626 F.3d 382, 389 (7th Cir. 2010) (elements of race discrimination claims under section 1981 and Title VII are essentially identical). Ms. Benton did not meet her burden of proof. The court finds that Ms. Benton was terminated for a non-discriminatory reason, namely that she violated important Library work rules.

2. Ms. Benton's retaliation claims under Title VII, 42 U.S.C. §2000e-3(a), and section 1981 required her to prove by a preponderance of the evidence that the Library

terminated her employment because she had complained of race discrimination. *Silverman v. Board of Education of City of Chicago,* 637 F.3d 729, 740 (7th Cir. 2011) ("Title VII prohibits an employer from taking an adverse employment action against an employee because she has filed an employment discrimination charge."); *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 399 (7th Cir. 2007) (retaliatory discharge of employment is prohibited by section 1981, as amended by the Civil Rights Act of 1991). Ms. Benton did not meet her burden of proof. The court finds that Ms. Benton was terminated, not because she had earlier made complaints of race discrimination and filed an EEOC charge and federal discrimination lawsuit, but because she violated important Library work rules.

3. Any Finding of Fact above, to the extent it constitutes a conclusion of law, is hereby incorporated by reference as a Conclusion of Law.

## Conclusion

For the reasons detailed above, the court concludes that plaintiff Penny Benton shall take nothing by her complaint and defendant Hamilton East Public Library is entitled to judgment on all claims against it. Final judgment will be entered accordingly.[6]

---

[6] After Ms. Benton presented her case-in-chief, the Library moved for Judgment on Partial Findings pursuant to Fed. R. Civ. P. 52(c). (Dkt. 58). The court took the motion under advisement, though it declined to render judgment until the close of all the evidence, which technically was a denial of the motion. The Library's motion addresses Ms. Benton's burden of proof as if the *McDonnell Douglas* burden shifting analysis applies but, as explained earlier, "once evidence has been presented at trial, the burden-shifting of the *McDonnell Douglas* method falls away, and the question is simply whether the evidence is sufficient to allow a reasonable [fact finder] to find in favor of the plaintiff." *Hall v. Forest Fiver, Inc.,* 536 F.3d 615, 621 (7th Cir. 2008). Thus, although the court DENIES the Library's Rule 52(c) motion, this entry covers the issues raised in that motion, and final judgment—based on all the evidence—is entered in favor of the Library.

So ORDERED.

Dated: 05/25/2012

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution to all counsel of record via CM/ECF.